NOTICE

Decision filed 02/25/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250824-U

NO. 5-25-0824

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* AUSTIN R., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Vermilion County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 22-JA-16 |
| | ) | |
| Amanda B., | ) | Honorable |
| | ) | Thomas M. O'Shaughnessy, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE SHOLAR delivered the judgment of the court.
Justices McHaney and Bollinger concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The judgment of the circuit court of Vermilion County that terminated the parental rights of the respondent mother was not against the manifest weight of the evidence, and therefore this court affirms the judgment.

¶ 2    The respondent, Amanda B. (Mother), contends the circuit court of Vermilion County erred when it entered an order that terminated Mother's parental rights to the minor child, Austin R., who was born in June of 2017 and is the biological child of Mother. Specifically, Mother contends the trial court's decision was against the manifest weight of the evidence with regard to the court's finding of Mother's unfitness, and with regard to the court's finding that it was in the best interests of Austin for Mother's parental rights to be terminated. For the reasons that follow, we affirm the judgment of the trial court.

1

¶ 3                                    I. BACKGROUND

¶ 4     On January 21, 2022, the State filed a petition for adjudication of wardship, wherein it alleged that Austin was neglected in that (1) his "custodial parent fail[ed] to provide the proper and necessary support, education, and other remedial care required for" Austin's welfare; and (2) he was under the age of 14 years and he "was left without supervision for an unreasonable period of time without an adequate plan of care and without regard for [his] mental or physical health, safety or welfare." On March 9, 2022, an "admonishment hearing" was held, with an interpreter sworn in to provide services for Mother. The State requested "a psychological and a parenting capacity assessment." Thereafter, counsel appointed to represent Mother stated that because Mother was "a parent with a disability," counsel believed that the case should be serviced by the Illinois Department of Children and Family Services (DCFS) intact division, which could offer "greater access *** to sign language resources, interpreters, and other services" needed by Mother.

¶ 5     On March 31, 2022, the State filed a motion for shelter care, wherein it alleged that since the admonishment hearing, Mother had failed to communicate with DCFS and had not made Austin available to DCFS, and that when Austin was seen at his school, he had "multiple bruises and marks *** with no explanation." A shelter care hearing was held on April 1, 2022. A sign language interpreter was sworn in to provide services for Mother. Traci Conroy testified that she was the intact caseworker for DCFS on the case, and that Mother had not communicated with Conroy when she tried to set up opportunities to see Austin. Conroy further testified that the individual Austin was staying with, who was fictive kin, was at first "very combative" with Conroy and was uncooperative as well. Conroy thereafter testified that eventually she had to go to Austin's

2

school to see Austin. She testified that Austin had a scrape under his eye, bruises on his arms, and a welt on his back, but agreed that these could be caused by "the child's activities."

¶ 6    When asked what services were recommended for Mother, Conroy testified "anger management," and stated that a servicing agency, New Directions, was "trying to put a book together that would help her understand with her IQ being so low." She agreed there were "added difficulties here with [Mother] needing a sign language interpreter," but that DCFS had remedied those difficulties. She testified that other recommended services for Mother were parenting services and a mental health evaluation, the latter of which had not yet been completed. Conroy testified that a behavioral analyst had evaluated Mother, but Conroy did not testify as to the results of that evaluation. Ultimately, she testified that she did not believe Austin could remain with fictive kin due to "[n]on-compliance" and lack of communication from fictive kin. She testified about concerns she had for Austin's welfare, including the fact that Austin had been scheduled to be tested for autism, but caretakers did not bring Austin to the appointment. Conroy testified that during the course of the case, Conroy learned that Mother had a legal guardian, Ann East, who was Mother's biological mother. Conroy testified that an assessment had determined that Mother was "unable to independently make decisions at this time due to her mental health," that a psychiatric evaluation was recommended for Mother, and that Mother could not "independently decide on where Austin could be placed."

¶ 7    At the conclusion of the hearing, the trial court stated that it found "an immediate and urgent necessity to remove" Austin from his home and to place his care with DCFS. The trial court thereafter entered a written order finding the same. The written order also directed DCFS to procure a parenting capacity assessment, psychological assessment, and psychiatric assessment for Mother.

3

¶ 8    On July 12, 2022, Mother's psychological evaluation report was filed. Therein, Dr. Marilyn Marks Frey wrote that Mother's history indicated that Mother was a 34-year-old female with a history of childhood DCFS involvement, multiple psychiatric hospitalizations, psychotropic medication, and issues managing her anger and being medication compliant. Dr. Frey noted as well that Mother was hearing impaired and communicated by means of ASL (American Sign Language), as did her paramour, who also was hearing impaired. Dr. Frey further noted that when under Mother's care, Austin got outside of the home on multiple occasions, and that even though Mother was provided alarms and flashing lights to help monitor when Austin tried to leave the home, there had been four additional incidents of "poor supervision." She wrote that Austin presented as developmentally behind for his age, and that concerns existed that Mother's cognitive functioning and judgment were impaired as well.

¶ 9    Dr. Frey also wrote about her interview with Mother, noting that when the subject of DCFS was raised, Mother "started to shake and become reactive," then "repeatedly said, with angry demeanor," that she did not want DCFS to take Austin, and that she could care for Austin. Dr. Frey noted that Mother denied "ever [being] in trouble with the law," which was inconsistent with documentation that showed "that a legal history exists." She wrote, "[c]oncerns exist that [Mother] does not perceive her part in Austin's being removed." In her summary of her meeting with Mother, Dr. Frey noted that when Mother wanted to call her paramour, but was not allowed to, Mother "was very upset and angry," and that "[t]his was of concern" to Dr. Frey. Dr. Frey wrote, with regard to the results of the cognitive testing Dr. Frey conducted, that Mother exhibited "very poor ability to evaluate and use past experiences in responding to new situations," and that Mother had "very poor ability to demonstrate practical knowledge and judgment." She further wrote that "[c]ognitive limitations and being deaf, which impacts functioning," had to be considered when

4

assessing Mother's mental health. She diagnosed Mother with mild intellectual disability, posttraumatic stress disorder, disruptive mood dysregulation disorder, general anxiety disorder, and dependent personality disorder. Dr. Frey thereafter wrote that "[i]ntellectual limitations are definitely contributing to [Mother's] poor insight, judgment and difficulty in caring for" Austin, and that she had concerns regarding Mother's "ability to benefit from coaching/training due to reactive personality traits as well as intellectual limitations." She wrote, "I do not believe that [Mother] has the ability to consistently satisfy the typical demands of adulthood without assistance."

¶ 10     An adjudicatory hearing was held on March 22, 2023. A sign language interpreter was sworn in to assist Mother during the hearing. Following the hearing, the trial court entered a written order finding Austin to be neglected, on the basis of the testimony of several witnesses at the hearing who testified about what the trial court referred to as "multiple incidents of [Austin] outside of the home unsupervised." The order stated that the neglect "was inflicted by" Mother. The order set a dispositional hearing for June 15, 2023. Thereafter, the June 15, 2023, hearing was continued due to the unavailability of a sign language interpreter. Ultimately, the dispositional hearing was held on August 17, 2023, with a sign language interpreter sworn in to assist Mother. Following the hearing, the trial court entered a written order finding Austin to be neglected, making him a ward of the court, and placing him in the custody and care of DCFS. A permanency hearing was set for November 16, 2023. In a separate order, the trial court ordered a parenting capacity assessment of Mother.

¶ 11     At the November 16, 2023, permanency hearing, a sign language interpreter was sworn in to assist Mother. The State offered into evidence a permanency report that was filed on October 27, 2023. Based upon the contents of that report, the State recommended that the trial court make

a finding that Mother had made "some efforts" on her service plan but had "not made reasonable efforts [or] reasonable and substantial progress." The State further recommended that the court "continue the return home goal and *** set this for permanency hearing in three months." Mother's counsel asked the court to find reasonable efforts and reasonable progress, and to maintain the return home goal. The trial court thereafter stated, "I do find that Mother has made reasonable efforts. She's made the best efforts she can make." The trial court added that it could not find that Mother had made reasonable progress. The court continued the return home goal and set the case for a hearing on February 16, 2024.

¶ 12    On February 15, 2024, Mother's counsel filed a motion to withdraw, wherein she noted multiple *pro se* filings by Mother asking for new counsel. Counsel also noted that due to Mother's deafness, it was difficult for counsel to assess how well Mother understood the legal proceedings involving Austin, and to otherwise communicate with Mother. The trial court continued the permanency hearing to April 18, 2024.

¶ 13    At the outset of the April 18, 2024, permanency hearing, at which a sign language interpreter was present to assist Mother, the trial court discussed the motion to withdraw, and admonished Mother as to her rights and responsibilities if she were to represent herself. The trial court ruled that it would deny counsel's motion to withdraw and recessed the hearing so that Mother could decide if she wished to represent herself. Following the recess, Mother elected to proceed with her current counsel.

¶ 14    The sole witness to testify was Amanda Davis, who testified that she was a permanency worker for DCFS. Davis testified that during a visit with Mother, Austin became violent, told Mother that she hated her, and "threw chairs." This led to a suspension of Mother's visitation with Austin. When asked by Mother's counsel what DCFS wanted Mother "to do right now to help"

6

facilitate the return of Austin, Davis testified, "the thing that's holding us back is a lack of appropriate progress." Davis added, "the services have been completed; however, the behaviors and attitudes that cause concern for DCFS have not changed." Davis added that Mother did not presently have any services in place, because she had been discharged from all of them.

¶ 15    The trial court stated that it would make a finding of reasonable efforts, but not reasonable and substantial progress. The permanency goal would remain return home. The trial court stated that for it to find both reasonable efforts and reasonable and substantial progress, Mother would have to "demonstrate the stability and capacity to parent, complete a parenting capacity evaluation and follow all recommendations." The court found that Mother had "not yet demonstrated the stability and capacity to parent," and that Austin was "not stable enough to return home." Mother's service plan was amended to provide individual counseling for her.

¶ 16    On July 17, 2024, the trial court entered a written order stating that a permanency hearing had been held on that date, the permanency goal would remain return home, Mother had made "some efforts" toward the return of Austin, but Mother had not made reasonable efforts and had not made reasonable and substantial progress. The order stated that the services required by the court and the service plan had been provided, but that Mother still had "not demonstrated the stability/capacity to parent." There is no transcript of the July 17, 2024, permanency hearing in the record on appeal.

¶ 17    On November 6, 2024, another permanency hearing was held. A sign language interpreter was present via Zoom to assist Mother. At the outset of the hearing, Mother's counsel noted that Mother was holding a sign that was critical of counsel's performance in the case. Counsel described her recent interactions with Mother, then stated that she was again moving to withdraw from the case. The trial court noted the communication problems between Mother and Mother's

7

counsel but stated that the court did "not believe that [Mother was] capable of representing herself in these proceedings." The trial court denied the motion to withdraw.

¶ 18    The first witness to testify was Davis. Of relevance to this appeal, Davis testified that over the last reporting period, Mother had not participated in parenting classes or parenting coaching, despite the fact that DCFS had sign language interpreters available to assist Mother. When asked if Mother had completed anger management classes, Davis testified, "Yes. In so much as it wasn't a successful completion, as more of a maximum benefit received." Davis testified that a translator worked with Mother during that training, and the training was provided at Mother's "level." When asked if, over the last reporting period, there had "still been some issues" that led DCFS to believe Mother needed "help in the area of anger management," Davis testified that there were, then testified that Mother continued to send "aggressive" text messages to Davis. Davis acknowledged the texts did not contain threats or cursing. She further acknowledged that getting other mental health services for Mother was challenging due to the need for an interpreter to assist Mother. Davis testified that she believed Mother was "unfit at this time," in part because of the anger management issues, but also because of Davis's "concerns about the intellectual ability [of Mother] to safely parent Austin." Davis agreed that the results of a recent parenting capacity evaluation "indicated that [Mother] would not be able to parent Austin on her own," and that Mother's paramour also "would not be able to parent Austin or offer any assistance to" Mother.

¶ 19    At the conclusion of the hearing, the State recommended that the trial court make a finding of "no efforts and no progress," and that the permanency goal be changed "to substitute care pending the determination on the termination of parental rights." Mother's counsel recommended a finding of reasonable efforts, stating that Mother was willing to engage in mental health counseling, but that DCFS or its affiliated agencies were not able to provide it to her. Counsel

8

further recommended a finding of "some progress" and asked for the permanency goal to remain return home. The trial court found that the permanency goal should be changed as the State requested and further found that the current goal had been entered "nearly 20 months ago." The court found that Mother still had "not demonstrated the stability and capacity to parent this special needs child," and that during the latest reporting period, Mother had "made some efforts, but not reasonable efforts and not reasonable and substantial progress towards a return home."

¶ 20     On November 18, 2024, the State filed a petition to terminate Mother's parental rights. Therein, the State alleged that Mother was unfit to parent Austin because she had failed to (1) maintain a reasonable degree of interest, or concern, or responsibility for Austin's welfare, and (2) make reasonable progress toward the return of Austin during the nine-month period of February 6, 2024, to November 6, 2024.

¶ 21     A fitness hearing was held on May 2, 2025. Two sign language interpreters were sworn in to assist Mother. The first witness to testify was Dr. Judy Osgood. Dr. Osgood testified that she was a licensed clinical psychologist in private practice in Champaign, Illinois. She testified about her extensive education and experience and was thereafter certified by the court as an expert witness "in the area of clinical psychology, including opinions pertaining to parenting capacity." Dr. Osgood testified that the procedure she used for determining parenting capacity, which she described in detail, was a generally accepted practice in the field.

¶ 22     Dr. Osgood testified that in this case, she spent an hour and a half observing Mother and Austin, with Mother's paramour present as well. After the observation, she conducted an interview with Mother that lasted "around an hour, hour and a half." As part of her assessment, she conducted a separate, private interview with Mother's caseworker. She testified that prior to her assessment, she was provided with the integrated assessment by DCFS, the service plan, a prior completed

psychological evaluation of Mother, visitation reports, and a permanency hearing report. Dr. Osgood testified that an interpreter was present throughout the process of assessing Mother's parenting capacity, as well as during Mother's mental status examination.

¶ 23    Dr. Osgood testified that the results of Mother's mental status examination were consistent with Mother's reported history, and that Mother "appeared to have cognitive delays, developmental delays, difficulties with verbal comprehension, [and] difficulties really understanding the circumstances that led DCFS" to become involved in the case. Mother also "did express a lot of anger in the course of this interview, and to the extent that I had to really redirect the topic because of the level of anger she had at one point." Dr. Osgood testified that Mother's ability to safely parent Austin was "limited, in which her cognitive developmental disorder, and mental disorders as well, really impaired her ability to successfully and safely parent Austin." Mother was cooperative during the clinical interview, but Mother "didn't really have the ability to comprehend and understand the risks that were presented by her and her paramour" to Austin.

¶ 24    When asked what the clinical interview told Dr. Osgood about Mother's "ability to safely parent," Dr. Osgood testified, "That she really was very limited and unlikely to be able to safely parent her son." She testified that her review of Austin's developmental history and current status in foster care "indicated the drastic positive changes that Austin made being placed in a foster home where his needs were being met, where he really had stability, where he was being provided with a secure home, where he felt secure." She testified that during the parent-child observation she conducted, Austin was at first "calm" and "seemed to enjoy" his interaction with Mother and her paramour. Dr. Osgood testified that "as the visit progressed, they both seemed to struggle with being able to interact with [Austin] in an age and developmentally-appropriate way." Dr. Osgood testified that Mother "didn't really know how to relate to him, or how to engage him." She testified

10

that "Austin became increasingly frustrated as this visit went on," and stated that she wondered if Austin was having increased anxiety because the visit reminded him of when he was in Mother's custody and she failed to adequately care for him. She ended the observation after an hour and a half, noting that Austin "was becoming more agitated." Dr. Osgood testified that the observation led her to conclude "that due to her cognitive and developmental disabilities, [Mother] just wasn't really able to interact, parent, supervise, or even understand her son."

¶ 25 Dr. Osgood testified that Mother's caseworker told Dr. Osgood that Mother "had completed *** two anger management classes but hadn't made progress." She testified that her opinion was that Mother "just really wasn't able to make progress or learn." She testified that this opinion was held to a reasonable degree of psychological certainty. When asked how long she believed Mother's inability to safely parent would last, Dr. Osgood testified, "My opinion is that it's chronic, that it's—because the intellectual disabilities, developmental disabilities are chronic, and in the context of that, [Mother] also presented with some mental disorders." She added that Mother had "a significant mental health history that was untreated," that Mother "wasn't taking medication anymore," and that Mother "had a significant history of convictions for assault, two arrests for domestic violence to children." She testified that this opinion, too, was to a reasonable degree of psychological certainty. When examined by the trial court, Dr. Osgood testified that she did not believe there were additional services that could improve Mother's ability to parent safely, because Mother was "provided with extensive services through DCFS and really wasn't making any progress."

¶ 26 Candice Hall testified that she was a child welfare advanced specialist and caseworker for DCFS. She testified that she was involved in this case from May of 2022 to February of 2023, and that Mother completed a parenting education class in December of 2022, but that because the

11

organization providing the class still "had concerns with her ability to parent," Mother was rereferred in February of 2023. Hall testified that Mother completed an anger management class in February of 2023, but that DCFS "still had concerns with her behaviors, so the plan was to re-refer." She testified that when she "handed off" the case in February of 2023, concerns also included Mother's "ability to focus and engage with her son for an extended period of time." Hall testified that Mother "was very easily distracted" and that Mother's paramour ended up doing much of the interacting during visits with Austin. She added that "there were ongoing concerns with her playing on her phone, needing redirection to tend to her son's needs." With regard to communicating with Mother about the case by text message, Hall testified, "I had to eventually block her phone number and have all communications go through my supervisor because of the intensity of the harassment via phone." On cross-examination, Hall testified that the parenting classes provided to Mother were at "a level for somebody who has some cognitive impairments," and that a sign language interpreter was present to assist Mother.

¶ 27    Davis testified that she took over as Mother's caseworker in February of 2023. She testified that Mother engaged in anger management training a second time, but was discharged, with the agency that provided the training indicating that Mother was "basically working on the same things over and over again," and that continuing the class "would be diminishing return" that would provide "no more benefit." Davis testified that during the time Mother was taking the class a second time, Davis continued to see "some of the same anger issues" that were present before, such as "aggressive messages via text." She testified that Mother's rereferral for parenting services also resulted in discharge because the provider "felt diminishing return, like the maximum benefit had been received." Davis testified that even after Mother reengaged in parenting services, "there continued to be ongoing issues with [her] attention span." She testified that another concern for

12

DCFS was Mother's inability to understand or acknowledge Austin's medical conditions. Davis testified that Mother "refused to acknowledge that he had been diagnosed with a seizure disorder." She clarified that Mother "would seem to acknowledge it in the moment, but then subsequently, in text messages that she would send to me asking questions or stating things, would seem to not understand that he had a seizure disorder." Davis also had continuing concerns with Mother's "ongoing kind of consistent hostility," which led Davis to believe Mother's "mental health needs were not being met any longer in regards to possibly medication." Davis testified that other continuing concerns of DCFS included Mother's difficulty retaining "information and understanding when meetings" were scheduled, and "confusing dates and times." She testified that Mother "showed up an entire week early" for her parenting capacity assessment and had "ongoing just really comprehension issues." On cross-examination, Davis agreed that Austin would need an adult to manage his seizure medication, as well as medication he was taking for attention deficit hyperactivity disorder. She testified that based on her experience with Mother, Mother would not be able to handle managing Austin's medications for him and would not be able to manage Austin's "behavioral needs." At the conclusion of the hearing, the trial court took the matter under advisement.

¶ 28    On June 18, 2025, the trial court entered a 50-page, single-spaced typewritten order in which it found Mother unfit. The court found that the State had proved all of the allegations in the petition by clear and convincing evidence. The court stated that it was conforming the pleadings to the proofs, and that pursuant to the applicable statute, the court was also finding Mother unfit due to "an inability to discharge parental responsibilities, as supported by competent evidence of an intellectual disability and a mental impairment, and her inability to discharge parental responsibilities will extend beyond a reasonable period of time." The court provided extensive

13

legal and evidentiary justification for each of its findings. Of relevance to our disposition of this appeal, the court found that one of the bases upon which Mother was unfit was her failure to make reasonable progress toward the return of Austin during the nine-month time period of February 6, 2024, to November 6, 2024. With regard to this basis, the trial court noted that Mother argued that DCFS failed to provide services at Mother's level for extended periods of time. The court rejected this argument, stating that it was contradicted by the record, which showed that Mother was provided services at her level of functioning. The court further found that the documentary evidence and testimony of witnesses supported the finding that by July of 2023, Mother, "due to her intellectual, psychological, and developmental disabilities, had progressed as far as she was capable in her parenting skills and emotional and anger regulation, and that further progress was not reasonably likely for her." The court thereafter noted that "[n]othing in the record suggests that Mother's progress during the designated period was sufficiently demonstrable and of such a quality that Austin could have been returned to her in the near future." The court found that, to the contrary, the evidence was "clear and convincing that Mother will never be capable of demonstrating such progress."

¶ 29    On October 9, 2025, a best interests hearing was held. At the outset of the hearing, the trial court stated that it had "received and reviewed the best interest report filed July 7, 2025." The State stipulated to the contents of the report and declined to present additional evidence. Mother's counsel also stipulated to the contents of the report, but asked to call Austin's current caseworker, who was assigned to the case in May of 2025, to testify. Prior to taking that testimony, the trial court swore in a sign language interpreter, who was available via Zoom, to assist Mother.

¶ 30    Ryan Boone testified that he was a child welfare specialist with Family Core, a private agency contracted by DCFS. He testified that he knew Austin and had visited Austin multiple

14

times since being assigned to the case in May of 2025. He testified about Austin's medical needs, and the specialists Austin visited on a regular basis. Boone testified that Austin attended "a specialized behavior school," and that Austin's behavior and academic performance had improved over the last year. He testified that although they were trying to find a specialized school for Austin that was closer to his foster parent's home, there was no discussion of returning him to "regular school."

¶ 31 Boone testified that Austin got along well with the children, and grandchildren, of his foster parent, and that Austin's foster parent had signed permanency commitments expressing a desire to adopt Austin. He testified that the foster parent managed "Austin's medical needs and psychiatric needs appropriately," and was "very organized" in terms of keeping up with schedules and appointments. He testified that she also managed Austin's medications appropriately. Boone described Austin's foster parent as "one of the most committed foster parents that" he had worked with and testified that he believed she could cope with any new needs that might arise for Austin. He was not aware of any "red flags" with Austin's placement. Boone testified that Austin was presently eight years old and had never mentioned Mother to Boone. He testified that he believed it was in Austin's best interests to be adopted by his foster parent.

¶ 32 Mother testified, via her interpreter, that she was very upset and did not want her son taken away from her. She testified that she would take Austin to his medical appointments and give him his medicine. Mother testified that she would take Austin to school, including a special school if needed. She testified that she kept things in folders and was well organized.

¶ 33 Following argument, the trial court stated that it found that the State had proven, by a preponderance of the evidence, that it was in Austin's best interests for Mother's parental rights to be terminated. The trial court stated that it had considered the requisite statutory factors, which the

15

court listed. The court noted that a written order would follow. On October 10, 2025, the trial court entered a written dispositional order that was consistent with the court's verbal pronouncements, and that specifically listed the statutory factors the trial court had considered in making its determination. This timely appeal followed.

¶ 34                                 II. ANALYSIS

¶ 35    On appeal, Mother contends the trial court's decision to terminate her parental rights was against the manifest weight of the evidence. Mother presents the appropriate standard of review for this court, as well as cases relevant to the grounds of unfitness and best interests that were found in this case; however, Mother does not present any specific argument with regard to how Mother believes the trial court erred in its decision. Instead, with regard to fitness, Mother's appellate brief contains a single paragraph of argument, in which Mother attacks DCFS, claiming that it did not provide adequate services and opportunities to Mother, essentially depriving her of the chance to succeed in her service plans. With regard to best interests, Mother's appellate brief likewise contains a single paragraph of argument, in which Mother focuses on her efforts to reunite with Austin; nowhere in her brief does she discuss Austin's foster placement or the trial court's best interests findings related thereto.

¶ 36    In its brief, the State notes the deficiencies in Mother's appellate brief, then addresses the merits of the trial court's decision, explaining why it believes the decision should be affirmed. Mother did not file a reply brief. In the interests of justice, we choose to overlook the deficiencies in Mother's opening brief. Based upon our independent review of the entire record on appeal, as well as the cases cited below and the trial court's orders, we affirm the judgment of the trial court.

¶ 37    Parents have a fundamental liberty interest in the care, custody, and management of their children. See, *e.g.*, *In re D.T.*, 212 Ill. 2d 347, 363 (2004). Under certain circumstances, however,

16

a circuit court has the authority to terminate parental rights involuntarily. The involuntary termination of parental rights under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2024)) is a two-step process. *In re M.I.*, 2016 IL 120232, ¶ 20. The State must first prove by clear and convincing evidence that the parent is unfit under any of the discrete and independent grounds listed in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). *M.I.*, 2016 IL 120232, ¶ 20; *In re C.W.*, 199 Ill. 2d 198, 217 (2002) ("the grounds set forth in section 1(D) each provide a discrete basis for a finding of unfitness"). Although the State may rely on several grounds in its motion to terminate parental rights, a finding adverse to the parent on any single ground is sufficient to support a subsequent termination of parental rights. *C.W.*, 199 Ill. 2d at 217. In other words, "only one ground of unfitness need be proved to find a parent unfit." *In re J.P.*, 261 Ill. App. 3d 165, 174 (1994).

¶ 38     If the court finds that a parent is unfit, the matter proceeds to a second hearing, at which the State must prove by a preponderance of the evidence that it is in the best interests of the minor children to terminate parental rights. *D.T.*, 212 Ill. 2d at 352, 366. At this stage of the proceedings, the court's focus necessarily shifts to the best interests of the children and away from the rights of the parent. *In re P.S.*, 2021 IL App (5th) 210027, ¶ 30. "The parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life" (*D.T.*, 212 Ill. 2d at 364), because a prompt, just, and final resolution of a child's status, as opposed to having that status remain in limbo, is in the child's interests. *In re D.L.*, 191 Ill. 2d 1, 13 (2000).

¶ 39     On appeal, this court accords great deference to the trial court's decisions in termination proceedings because the trial court is in a better position to observe witnesses and to judge their credibility. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53. This court does not reweigh the evidence or reassess the credibility of witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). Unless the

17

trial court's findings of parental unfitness or the child's best interest are against the manifest weight of the evidence, this court will not disturb the trial court's findings. *In re A.W.*, 231 Ill. 2d 92, 104 (2008). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the determination is unreasonable, arbitrary, or not based on the evidence presented. *In re D.F.*, 201 Ill. 2d 476, 498 (2002).

¶ 40    In this case, one of the alleged statutory grounds of unfitness was Mother's failure to make "reasonable progress" toward the return of the child during any nine-month period following the adjudication of neglect. 750 ILCS 50/1(D)(m)(ii) (West 2024). "Reasonable progress" is judged by an objective standard focused on the goal of returning the child to the parent. *In re D.D.*, 309 Ill. App. 3d 581, 589 (2000). The "benchmark" for measuring reasonable progress "encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001). "At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006). A parent has made reasonable progress when the trial court, "in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991).

¶ 41    As described above, the trial court in this case found that Mother was unfit due to her failure to make reasonable progress toward the return of Austin during the nine-month time period of February 6, 2024, to November 6, 2024. The court noted that Mother argued that DCFS failed to provide services at Mother's level for extended periods of time, an argument very similar to that made by Mother on appeal. The trial court rejected this argument, stating that it was contradicted

18

by the record, which showed that Mother was provided services at her level of functioning. The trial court further found that the documentary evidence and testimony of witnesses supported the finding that by July of 2023, Mother, "due to her intellectual, psychological, and developmental disabilities, had progressed as far as she was capable in her parenting skills and emotional and anger regulation, and that further progress was not reasonably likely for her." The court thereafter noted that "[n]othing in the record suggests that Mother's progress during the designated period was sufficiently demonstrable and of such a quality that Austin could have been returned to her in the near future." The court found that, to the contrary, the evidence was "clear and convincing that Mother will never be capable of demonstrating such progress."

¶ 42    As the State notes on appeal, the evidence adduced in this case supports the trial court's conclusions. Both the report submitted by Dr. Frey, and the live testimony of Dr. Osgood, extensively discussed and analyzed Mother's intellectual, psychological, and developmental disabilities, and the testimony of Davis and Hall presented additional evidence of how those disabilities impacted Mother's ability to parent Austin on a day-to-day basis. As early as July 12, 2022, when her report was filed, Dr. Frey expressed the concern that "[i]ntellectual limitations [were] definitely contributing to [Mother's] poor insight, judgment and difficulty in caring for" Austin. She further wrote that she had concerns regarding Mother's "ability to benefit from coaching/training due to reactive personality traits as well as intellectual limitations," and added, "I do not believe that [Mother] has the ability to consistently satisfy the typical demands of adulthood without assistance."

¶ 43    Likewise, at the April 18, 2024, permanency hearing, when asked by Mother's counsel what DCFS wanted Mother "to do right now to help" facilitate the return of Austin, Davis testified, "the thing that's holding us back is a lack of appropriate progress." Davis added, "the services

19

have been completed, however, the behaviors and attitudes that cause concern for DCFS have not changed." At the November 6, 2024, permanency hearing, Davis testified that over the last reporting period, Mother had not participated in parenting classes or parenting coaching, despite the fact that DCFS had sign language interpreters available to assist Mother. When asked if Mother had completed anger management classes, Davis testified, "Yes. In so much as it wasn't a successful completion, as more of a maximum benefit received." Davis testified that a translator worked with Mother during that training, and the training was provided at Mother's "level." When asked if, over the last reporting period, there had "still been some issues" that led DCFS to believe Mother still needed "help in the area of anger management," Davis testified that there were, then testified that Mother continued to send "aggressive" text messages to Davis. She testified that she believed Mother was "unfit at this time," in part because of the anger management issues, but also because of Davis's "concerns about the intellectual ability [of Mother] to safely parent Austin." Davis agreed that the results of a recent parenting capacity evaluation "indicated that [Mother] would not be able to parent Austin on her own," and also that Mother's paramour "would not be able to parent Austin or offer any assistance to" Mother.

¶ 44 At the conclusion of the November 6, 2024, permanency hearing, the trial court found that the permanency goal should be changed as the State requested, and further found that the current goal had been entered "nearly 20 months ago." The court found that Mother still had "not demonstrated the stability and capacity to parent this special needs child," and that during the latest reporting period, Mother had "made some efforts, but not reasonable efforts and not reasonable and substantial progress towards a return home."

¶ 45 At the May 2, 2025, fitness hearing, Hall testified that the parenting classes provided to Mother were at "a level for somebody who has some cognitive impairments," and that a sign

20

language interpreter was present to assist Mother. Indeed, the record on appeal confirms that sign language interpreters were provided to assist Mother at all relevant hearings in this case. Accordingly, we agree with the trial court that Mother's attacks on DCFS are misguided and are contradicted by the evidence. Davis testified at the fitness hearing too, stating that Mother engaged in anger management training a second time, but was discharged, with the agency that provided the class indicating that Mother was "basically working on the same things over and over again," and that continuing the class "would be diminishing return" that would provide "no more benefit." She testified that during the time Mother was taking the class a second time, Davis continued to see "some of the same anger issues" that were present before, such as "aggressive messages via text." She testified that Mother's rereferral for parenting services also resulted in discharge because the provider "felt diminishing return, like the maximum benefit had been received."

¶ 46    Davis testified that even after Mother reengaged in parenting services, "there continued to be ongoing issues with [her] attention span." She testified that another concern for DCFS was Mother's inability to understand or acknowledge Austin's medical conditions. Davis testified that Mother "refused to acknowledge that he had been diagnosed with a seizure disorder." She clarified that Mother "would seem to acknowledge it in the moment, but then subsequently, in text messages that she would send to me asking questions or stating things, would seem to not understand that he had a seizure disorder." Davis also had continuing concerns with Mother's "ongoing kind of consistent hostility," which led Davis to believe Mother's "mental health needs were not being met any longer in regards to possibly medication." Davis testified that other continuing concerns DCFS had included Mother's difficulty retaining "information and understanding when meetings" were scheduled, and "confusing dates and times." She testified that Mother "showed up an entire week early" for her parenting capacity assessment, and had "ongoing just really comprehension

21

issues." On cross-examination, Davis agreed that Austin would need an adult to manage his seizure medication, as well as medication he was taking for ADHD. She testified that based on her experience with Mother, Mother would not be able to handle managing Austin's medications for him, and would not be able to manage Austin's "behavioral needs."

¶ 47    The record demonstrates, unequivocally, that the trial court was correct in its conclusion that "in the near future" it would not be able to order Austin returned to Mother's custody, and thus that Mother had failed to make reasonable progress. See *L.L.S.*, 218 Ill. App. 3d at 461. In reaching this conclusion, we reiterate that the trial court was in the best position to judge the credibility of the witnesses, including Mother (see *Dal. D.*, 2017 IL App (4th) 160893, ¶ 53), and that we will not reweigh the evidence or reassess the credibility of those witnesses. *M.A.*, 325 Ill. App. 3d at 391. The opposite conclusion to that reached by the trial court in this case is not clearly apparent, and the trial court's determination is not unreasonable, arbitrary, or not based on the evidence presented; accordingly, the trial court's finding is not against the manifest weight of the evidence (see *D.F.*, 201 Ill. 2d at 498), and we will not disturb it. *A.W.*, 231 Ill. 2d at 104.

¶ 48    As explained above, "only one ground of parental unfitness need be proved to find a parent unfit." *J.P.*, 261 Ill. App. 3d at 174. Because a parent may be found unfit if the State proves any one of the statutory grounds for unfitness by clear and convincing evidence, we will affirm the trial court's decision if the evidence supports its finding as to any of the grounds. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶¶ 63-64. Accordingly, we affirm the trial court's finding of unfitness on the basis of Mother's failure to make reasonable progress toward the return of Austin during the nine-month time period of February 6, 2024, to November 6, 2024.

¶ 49    Likewise, we conclude that the trial court's decision regarding the best interests of Austin was not against the manifest weight of the evidence. In deciding whether termination of parental

22

rights is in a child's best interests, the trial court must consider the following statutory factors: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural, and religious background and ties; (4) the child's sense of attachment; (5) the child's wishes; (6) the child's community ties; (7) the need for permanence and stability and the continuity of the child's relationships with parental figures, siblings, and other family members; (8) the uniqueness of each child and family; (9) the risks inherent in substitute care; and (10) the preferences of the individuals available to provide care. 705 ILCS 405/1-3(4.05) (West 2024). Although the court must consider all applicable statutory factors, it is not required to refer to each individual factor in rendering or explaining its decision. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 50    In this case, the trial court specifically stated, verbally and in writing, that it had considered the requisite statutory factors, and Mother does not challenge this on appeal. Moreover, ample evidence supported the circuit court's decision. Boone testified that he was a child welfare specialist with Family Core, a private agency contracted by DCFS. He testified that he knew Austin, and had visited Austin multiple times since being assigned to the case in May of 2025. He testified about Austin's medical needs, and the specialists Austin visited on a regular basis. Boone testified that Austin attended "a specialized behavior school," and that Austin's behavior and academic performance had improved over the last year. He testified that although they were trying to find a specialized school for Austin that was closer to his foster parent's home, there was no discussion of returning him to "regular school."

¶ 51    Boone testified that Austin got along well with the children, and grandchildren, of his foster parent, and that Austin's foster parent had signed permanency commitments expressing a desire to adopt Austin. He testified that the foster parent managed "Austin's medical needs and

23

psychiatric needs appropriately," and was "very organized" in terms of keeping up with schedules and appointments. He testified that she also managed Austin's medications appropriately. Boone described Austin's foster parent as "one of the most committed foster parents that" he had worked with. He testified that he believed she could cope with any new needs that might arise for Austin, and that he was not aware of any "red flags" with Austin's placement. Boone testified that Austin was presently eight years old, and had never mentioned Mother to Boone. He testified that he believed it was in Austin's best interests to be adopted by his foster parent.

¶ 52 In light of this extensive evidence, which is not contested, or even mentioned, by Mother in her brief on appeal, the opposite conclusion to that reached by the trial court regarding the best interests of Austin in this case is not clearly apparent, and the trial court's determination is not unreasonable, arbitrary, or not based on the evidence presented; accordingly, the trial court's finding is not against the manifest weight of the evidence (see *D.F.*, 201 Ill. 2d at 498), and we decline to disturb it. *A.W.*, 231 Ill. 2d at 104.

¶ 53                                    III. CONCLUSION

¶ 54 For the foregoing reasons, we affirm the judgment of the circuit court of Vermilion County.


¶ 55 Affirmed.

24